UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

AMERICAN FIRE AND CASUALTY   )
COMPANY, et al.,             )
                             )
            Plaintiffs       )
                             )
      v.                     )        1:20-cv-00250-JDL
                             )
WARREN PETTEGROW, et al.,    )
                             )
            Defendants       )

**RECOMMENDED DECISION ON MOTIONS
FOR SUMMARY JUDGMENT AND MOTION TO DISMISS**

In another action in federal court, a lobster wholesaler (Lobster 207, LLC) alleges Defendants (Warren Pettegrow, Lobster 207's former CEO, Anthony and Josette Pettegrow, Warren's parents, and Trenton Bridge Lobster Pound, Inc., the Pettegrow's family lobster business) engaged in conduct designed to deprive Lobster 207 of product and profits to which it was entitled. (Amended Complaint, 1:19-cv-552-LEW, ECF No. 184.) In this action, Defendants' insurers[1] seek a judgment declaring that they have no duty to provide a defense against the underlying lawsuit. (Complaint, ECF No. 1; Intervenor Complaint, ECF No. 43.) Defendants countersue the insurers for breach of contract and unfair claims settlement practices. (Answer and Counterclaim Complaint at 22–25, ECF No. 10; Complaint, 1:21-cv-00147-DBH, ECF No. 1.) The matter is before the Court on the insurers' motions for summary judgment, (ECF Nos. 34, 47), a motion to

---

[1] As a result of the procedural history discussed below, the various insurance companies among the parties are a mix of plaintiffs, intervenors, defendants, and crossclaim defendants. For convenience they are referred to by name or collectively as "the insurers" or "Plaintiffs."

dismiss one of Defendants' breach of contract counterclaims, (ECF No. 48), and Defendants' motions for summary judgment.  (ECF Nos. 55, 57.)

Following a review of the underlying amended complaint, the summary judgment record, and the parties' arguments, I recommend the Court find Plaintiffs have a duty to provide a defense and the Court grant and deny the parties' motions accordingly.

### PROCEDURAL HISTORY

Lobster 207 initiated the underlying lawsuit in December 2019 and subsequently amended its complaint against Defendants.  (Complaint, 1:19-cv-00552-LEW, ECF No. 1; Amended Complaint, 1:19-cv-00552-LEW, ECF No. 184).  In July 2020, American Fire and Casualty Company and Ohio Casualty Insurance Company initiated this lawsuit against Defendants for declaratory relief regarding the insurers' duty to defend. (Complaint, ECF No. 1.)   In May 2021, Hanover Insurance Company and Citizens Insurance Company of America intervened in this lawsuit seeking the same declaratory relief.  (Motion to Intervene, ECF No. 38; Intervenor Complaint, ECF No. 43.)

In June 2021, Warren filed a separate lawsuit against Ohio Casualty Insurance Company and Ohio Security Insurance Company for declaratory relief and breach of contract as result of their decision not to provide a defense under the policies they issued to Lobster 207 and Warren against the claims asserted in the underlying lawsuit. (Complaint, 1:21-cv-00147-DBH, ECF No. 1.)   At the request of the parties, the Court consolidated Warren's separate action with this matter.  (Consent Motion to Consolidate, ECF No. 45; Order, ECF No. 46.)

2

## LEGAL STANDARDS

### A.     Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'"  *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor.  *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015).  If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of the Plaintiff's claims, a trial-worthy controversy exists, and summary judgment must be denied as to any supported claim.  *Id.* at 78 ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)).  Unsupported claims are properly dismissed.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

### B.     Motion to Dismiss for Failure to State a Claim

A party may seek dismissal of a claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In reviewing a motion to dismiss under Rule 12(b)(6), a court "must evaluate whether the complaint adequately pleads facts that 'state

a claim to relief that is plausible on its face.'" *Guilfoile v. Shields*, 913 F.3d 178, 186 (1st Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In doing so, a court must "assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences therefrom," but need not "draw unreasonable inferences or credit bald assertions [or] empty conclusions."  *Id.* (alteration in original) (internal quotation marks omitted); *see Bruns v. Mayhew*, 750 F.3d 61, 71 (1st Cir. 2014) ("[A] court is 'not bound to accept as true a legal conclusion couched as a factual allegation.'" (quoting *Twombly*, 550 U.S. at 555)).  Federal Rule of Civil Procedure 12(b)(6) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To evaluate the sufficiency of the complaint, therefore, a court must "first, 'isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements,' then 'take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.'"  *Zell v. Ricci*, 957 F.3d 1, 7 (1st Cir. 2020) (alteration omitted) (quoting *Zenon v. Guzman*, 924 F.3d 611, 615-16 (1st Cir. 2019)).

## FACTUAL BACKGROUND[2]

### A.    The Policies

In December 2017, American Fire issued a commercial insurance policy to Trenton Bridge (Policy No. BKA 58 14 52 71) with a policy period from December 1, 2017 to

---

[2] For purposes of the summary judgment motions, the Court may look to the parties' statements of facts, which may cite documents in the record beyond the pleadings.  For purposes of the motion to dismiss, the Court only considers the pleadings and the documents incorporated by reference into the pleadings, such

December 1, 2018.  (American Fire 2017-18 Policy, ECF No. 1-1; PSMF ¶ 1.)   In December 2018, American Fire issued a practically identical commercial insurance policy to Trenton Bridge (Policy No. BKA 58 14 52 71) with a policy period from December 1, 2018 to December 1, 2019.  (American Fire 2018-19 Policy, ECF No. 1-2; PSMF ¶ 2.) Because the named entity on the policies is a corporation, the executive officers and directors also qualify as insureds "but only with respect to their duties as your officer or directors," and the stockholders also qualify as insureds "but only with respect to their liability as stockholders."  (American Fire 2017-18 Policy at 87; American Fire 2018-19 Policy at 97; PSMF ¶ 18.)

Coverage A of the Commercial General Liability Coverage Form provides in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

(American Fire 2017-18 Policy at 78; American Fire 2018-19 Policy at 88; PSMF ¶¶ 5, 7.)[3]  The insurance only applies to "bodily injury" or "property damage" that "is caused by an 'occurrence' that takes place in the 'coverage territory,'" and "occurs during the policy

---

as the underlying complaint and the policies.  In the circumstances of this case, however, where the state rule of law instructs the Court to examine only the underlying amended complaint and the policies, it may be a distinction without a meaningful difference.

[3] The policies provide other forms of coverage, such as for "personal and advertising injury," but the parties' dispute evidently does not involve those provisions.

period." (American Fire 2017-18 Policy at 78; American Fire 2018-19 Policy at 88; PSMF ¶ 6.)

The term "occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (American Fire 2017-18 Policy at 93; American Fire 2018-19 Policy at 103; PSMF ¶ 14.) "'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured" is excluded from coverage. (American Fire 2017-18 Policy at 79; American Fire 2018-19 Policy at 89; PSMF ¶ 17.) The term "property damage" is defined as

    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(American Fire 2017-18 Policy at 93–94; American Fire 2018-19 Policy at 103–104; PSMF ¶ 13; DRPSMF ¶ 13.)

In December 2017, Ohio Casualty issued an umbrella insurance policy to Trenton Bridge (Policy No. USO 58 14 52 71) with a policy period from December 1, 2017 to December 1, 2018. (Ohio Casualty Trenton Bridge 2017-18 Policy, ECF No. 1-3; PSMF ¶ 19.) In December 2018, Ohio Casualty issued a practically identical umbrella insurance policy to Trenton Bridge (Policy No. USO 58 14 52 71) having a policy period from December 1, 2018 to December 1, 2019. (Ohio Casualty Trenton Bridge 2018-19 Policy, ECF No. 1-4; PSMF ¶ 20.) The policies define as insureds "[a]ny of your partners, executive officers, directors, or employees but only while acting within the scope of their

duties."  (Ohio Casualty Trenton Bridge 2017-18 Policy at 20; Ohio Casualty Trenton Bridge 2018-19 Policy at 20; PSMF ¶ 34.)

The Coverage section within the Umbrella Coverage Form of the policies provides in relevant part:

> We will pay on behalf of the "Insured" those sums in excess of the "Retained Limit" that the "Insured" becomes legally obligated to pay by reason of liability imposed by law . . . because of "bodily injury," [or] "property damage," . . . that takes place during the Policy Period and is caused by an "occurrence" happening anywhere.

(Ohio Casualty Trenton Bridge 2017-18 Policy at 14; Ohio Casualty Trenton Bridge 2018-19 Policy at 14; PSMF ¶ 23.)  The policies contain practically identical definitions of key terms as those contained within the American Fire policies, including the definitions of "occurrence," and "property damage," as well as the same exclusion for intended or expected damage.  (Ohio Casualty Trenton Bridge 2017-18 Policy at 21–22; Ohio Casualty Trenton Bridge 2018-19 Policy at 21–22; PSMF ¶¶ 24, 28, 30, 35.)[4]

Ohio Security separately issued a package of insurance policies (Policy No. BKS 57 99 07 20) including a commercial general liability policy listing Lobster 207 and Warren Pettegrow as named insureds for three year-long policy periods from March 17, 2017 to March 17, 2020.  (Warren's Complaint ¶ 9, 1:21-cv-00147-DBH, ECF No. 1; Answer to Warren's Complaint ¶ 9, 1:21-cv-00147-DBH, ECF No. 6.)[5]  Ohio Casualty separately issued an umbrella insurance policy (Policy No. USO 57 88 07 20) listing Lobster 207 and

---

[4] The policies also refer to other forms of coverage, such as for an "insured contract," or "personal and advertising injury," but the parties' dispute evidently does not involve other forms of coverage.

[5] Ohio Security asserts that, by endorsement, Warren Pettegrow was no longer a named insured after April 2019, but that fact does not appear to be significant.  Nevertheless, Plaintiff's version is adopted here.

Warren Pettegrow as named insureds for the three successive policy periods between March 17, 2017 and March 17, 2020.  (Warren's Complaint ¶ 10; Answer to Warren's Complaint ¶ 10.)  The policies contain practically identical definitions of key terms as those contained within the American Fire policies, including the definitions of "occurrence," and "property damage," as well as the same exclusion for intended or expected damage.  (Ohio Security and Ohio Casualty Lobster 207 Policy Documents at 123–24, ECF No. 48-1.)

Citizens issued two commercial general liability policies to Trenton Bridge for different components of its business in September 2016.  (ISMF ¶ 1.)  Hanover issued a commercial umbrella policy to Trenton Bridge in September 2017.  (*Id.* ¶ 2.)  The policies were canceled shortly thereafter and the previously discussed policies from American Fire and Ohio Casualty were issued to Trenton Bridge.  (*Id.* ¶ 3.)  Hanover issued a Commercial follow form excess and umbrella policy to Trenton Bridge with a policy period of September 20, 2017 through September 20, 2018.  (*Id.* ¶ 5.)  The policies issued by Citizens and Hanover contained a commercial general liability coverage form with practically identical relevant coverage provisions, exclusions, and definitions of key terms as the American Fire and Ohio Casualty policies previously discussed.  (*Id.* ¶ 4; Intervenor Policy Excerpts at 35–50.)[6]

---

[6] The Intervenors cited an excerpt of the policy documents and might not have filed the complete versions of the policies.  Because the insurance policy forms have been largely standardized and because Defendants admit Plaintiffs' relevant statements of facts and do not dispute the contents of the policies, even if the Intervenors did not file the entire policies, the record is sufficient for the Court to rule on the Intervenors' motion for summary judgment.

**B.      Allegations of the Underlying Amended Complaint**

Lobster 207, LLC, operates as a co-op controlled by members of the Maine Lobstering Union and has a principal place of business in Trenton, Maine.  (Underlying Amended Complaint ¶¶ 1, 20–24.)  The Maine Lobstering Union, a Maine cooperative corporation and a division of the International Association of Machinists and Aerospace Workers ("IAMAW"), is the sole member of Lobster 207.  (*Id.*)  Defendants Anthony Pettegrow and Josette Pettegrow are the sole shareholders and officers of Defendant Trenton Bridge Lobster Pound, which has a principal place of business in Trenton, Maine.  (*Id.* ¶¶ 2–3.)  Defendant Warren Pettegrow is the son of Anthony and Josette Pettegrow.  (*Id.* ¶ 4.)

Trenton Bridge had two components, a retail business—consisting of a restaurant and website from which customers could order lobsters for shipment—and a wholesale business—consisting of the purchase of lobsters from fishermen, boats, docks, and other suppliers and the resale of the lobsters at a mark-up to wholesale customers, including traders, processors, restaurants, hotels, caterers and transportation companies.  (*Id.* ¶¶ 25–27.)  Between August 2016 and March 2017, Lobster 207 purchased the wholesale side of the business; Anthony and Josette signed noncompetition agreements regarding the wholesale business but continued to operate the retail business.  (*Id.* ¶¶ 10, 28–35.)  Warren, who was then the head of the wholesale business, became Lobster 207's CEO, and was permitted to continue to operate three side businesses, including a "smack" boat named *Poseidon*, as long as those endeavors did not interfere with his obligations to Lobster 207.  (*Id.* ¶¶ 10, 36–43.)  Pursuant to a supply and offtake agreement, Trenton Bridge could

continue to operate its lobster buying station solely for its retail business provided all unused lobsters were sold to Lobster 207 at a standardized price.  Warren could continue his lobster collection activities on the *Poseidon* provided all the lobsters collected were sold to Lobster 207 at the standardized price.  (*Id.* ¶¶ 41–43.)

Lobster 207 alleges that rather than cease their previous wholesale lobster operations as required by contract, Defendants formed an unlawful enterprise designed to enrich themselves at Lobster 207's expense.  (*Id.* ¶ 11, 44–56.)  Lobster 207 asserts the unlawful enterprise began on or about March 25, 2017 and continued through April 4, 2019, at which time Lobster 207 terminated Warren's employment.  (*Id.* ¶¶ 47, 248.)  The alleged self-dealing schemes described in the underlying amended complaint include:

a) "The BJ Co-op Scheme," in which Defendants falsely represented to Lobster 207 that Trenton Bridge had paid a $0.20 per pound premium to a business called "BJ Co-op" prior to the purchase of Defendants' wholesale business, causing Lobster 207 to significantly overpay for that source of lobster for more than two years, (*id.* ¶¶ 66–77);

b) "The Phantom Lobster Scheme," in which Defendants conspired with the manager of BJ Co-op to submit a false invoice in the amount of $55,269 for lobsters that were never intended to be delivered to Lobster 207, (*id.* ¶¶ 78–95);

c) "The Recoupment Scheme," in which Defendants falsified subsequent BJ Co-op invoices to recoup the $55,269 they had stolen but were compelled to pay back; (*id.* ¶¶ 96–106);

d) "The Customer Data Scheme," in which Defendants made material misrepresentations to Lobster 207 regarding their customer list and arranged for some customers to utilize a third-party lobster broker, rather than Lobster 207, (*id.* ¶¶ 107–16);

e) "The Lobster Crate Scheme," in which Defendants misrepresented the number of lobster crates that Trenton Bridge owned and had sold to Lobster 207, (*id.* ¶¶ 117–26);

f) "The Inventory Scheme," in which Defendants diverted or failed to deliver inventory that Lobster 207 had purchased from Trenton Bridge and then either resold that inventory to Lobster 207 a second time or sold that lobster to third-party wholesale customers and retained the proceeds, (*id.* ¶¶ 127–36);

g) "The *Poseidon* Scheme," in which Defendants submitted false invoices to Lobster 207 overcharging by $0.20 to $0.50 per pound for lobsters collected by the *Poseidon*, (*id.* ¶¶ 137–76);

h) "The Mixed Lobster Up-Charging Scheme," in which Defendants transmitted invoices to Lobster 207 reflecting the sale and delivery of lobsters at prices higher than they agreed. The sources of the lobsters reflected in these invoices (which consisted not only of lobsters unused by Trenton Bridge's retail business but also lobsters from other sources in the Mount Desert Island region) were misrepresented in order to conceal the fact that these lobsters should have been sold directly to Lobster 207 at the agreed upon price, (*id.* ¶¶ 177–91);

i) "The Dealer Up-Charging Scheme," in which Defendants purchased lobsters on behalf of Lobster 207 from other lobster dealers and then transmitted false Trenton Bridge

invoices to Lobster 207 with purchase prices that were greater than the price Trenton Bridge had paid those dealers, (*id.* ¶¶ 192–209);

j) "The Tubed Lobster Scheme," in which Defendants purchased lobsters preserved alive in a tube to be sold during the off-season and then sold those lobsters back to Lobster 207 at a price substantially higher than Defendants paid, (*id.* ¶¶ 210–230);

k) "The Embezzlement Scheme," in which Warren concealed and pocketed a $0.10 per pound premium that Lobster 207 decided to pay each of its members.  (*Id.* ¶¶ 231–37.)

Lobster 207 alleged the following causes of action: Count I –Racketeering in breach of 18 U.S.C. § 1962(c); Count II – Conspiracy to Racketeer; Count III – Fraud; Count IV – Conversion; Count V – Breach of Fiduciary Duty (against Warren only); Count VI – Civil Conspiracy; Count VII – Breach of Contract (against Warren only); Count VIII – Breach of Contract (against Trenton Bridge, Anthony, and Josette only); Count IX – Unjust Enrichment and Constructive Trust; and Count X – Declaratory Judgment (against Trenton Bridge only).  (*Id.* ¶¶ 265–337; PSMF ¶ 44.)

## C.    Claims Processing and Litigation

On April 5, 2019, Defendants retained counsel.  (PSMF ¶¶ 48–49.)  In August 2019, Lobster 207 sent defense counsel evidence preservation notices.  (*Id.* ¶ 50.)  Lobster 207 sued Defendants in December 2019.  (Underlying Complaint; PSMF ¶ 51.)  Defendants reported the claims to American Fire and Ohio Casualty on December 18, 2019.  (PSMF ¶ 52.)  A representative for American Fire and Ohio Casualty spoke with Josette on December 23, 2019, confirming receipt of the notice of suit.  (PSMF ¶ 53; DRPSMF ¶ 53.)  American Fire and Ohio Casualty performed a coverage analysis and, in February 2020,

referred the determination to outside counsel.  (PSMF ¶¶ 54–55; DRPSMF ¶¶ 54–55; DASMF ¶ 70; PRDASMF ¶ 70.)  The insurers made their determination regarding the duty to defend based on a review of the complaint and the policies and did not rely on any extrinsic evidence.  (DASMF ¶ 71.)  While finalizing its coverage position, Plaintiffs retained counsel to represent the defendants in the underlying action.  (PSMF ¶ 56.)  The insurers did not consult Defendants on the choice of attorney.  (DASMF ¶ 77.)  On March 30, 2020, American Fire and Ohio Casualty issued letters to Defendants stating that the insurers would provide a defense to the underlying action subject to several reservation of rights, including the right to disclaim coverage at a later date.  (*Id.* ¶¶ 57–62.)

In July 2020, counsel for Defendants submitted to American Fire and Ohio Casualty invoices for services for reimbursement, and the insurers filed this action for declaratory relief.  (*Id.* ¶¶ 63–64; Complaint, ECF No. 1.)   American Fire and Ohio Casualty reimbursed Defendants for $390,015 of the $471,570 invoiced.  (PSMF ¶ 66; DRPSMF ¶ 66.)  The insurers reduced the amounts invoiced by approximately $5,000 for pre-tender costs, approximately $1,100 for coverage consultation, approximately $1,650 for public relations strategy, and approximately $73,825 for attorney's fees based on the higher rates charged by an out-of-state law firm that Defendants retained as compared to the in-state firm Defendants retained.  (PSMF ¶ 67; DRPSMF ¶ 67.)  Defendants feared the future of their business and considered the RICO claims to be especially complex with a large financial exposure, which is why they also sought counsel from the out-of-state firm with additional experience in RICO cases.  (DASMF ¶¶ 74–75, 78–79); PRDASMF ¶¶ 74–75, 79.)  The rates the out-of-state firm charged Defendants represented a twenty percent

discount from their usual rates.  (DASMF ¶ 76, 81; PRDASMF ¶ 81.)  Defendants accepted the reimbursement from American Fire and Ohio Casualty but reserved their right to seek recovery of the remaining balance.  (PSMF ¶ 68.)

American Fire and Ohio Casualty initiated this lawsuit in July 2020 by filing a complaint seeking a declaratory judgment that they have no duty to provide a defense against the underlying action.  (Complaint, ECF No. 1.)  In October 2020, Defendants filed an answer and counterclaims for breach of contract, violations of Maine's Unfair Claims Settlement Practices Act, and reimbursement of attorney's fees incurred in the declaratory judgment action.  (Answer and Counterclaim Complaint, ECF No. 10.)

In May 2021, American Fire and Ohio Casualty moved for summary judgment on their declaratory action complaint and Defendants' counterclaims.  (American Fire and Ohio Casualty Motion, ECF No. 34.)  In anticipation of that summary judgment motion, Warren formally sought a defense against the underlying action from Ohio Security pursuant to the policy it issued to Lobster 207 and Warren.  (Warren's Complaint ¶ 13; Answer to Warren's Complaint ¶ 13.)  Ohio Security and Ohio Casualty denied a defense and indemnification.  (Warren's Complaint ¶ 14, Answer to Warren's Complaint ¶ 14; Letter, 1:21-cv-00147-DBH, ECF No. 1-1.)

In June 2021, Warren filed a separate declaratory judgment action seeking to avoid any gap in a defense in the underlying action.  (Warren's Complaint ¶ 15.)  Warren alleged a breach of contract claim for the denial of a defense and coverage, (*id.* ¶¶ 17–19), a breach of contract claim for an alleged violation of the implied duty of good faith and fair dealing

as a result of the insurer's disclosure of Warren's tender letter to Lobster 207, (*id.* ¶¶ 22–28), and one count for reimbursement of attorney's fees.  (*Id.* ¶¶ 20–21.)

After the Court consolidated the two insurance-related cases, intervenors Citizens and Hanover filed their motion for summary judgment, (ECF No. 47), Ohio Casualty and Ohio Security filed a motion to dismiss part of Warren's complaint regarding the Lobster 207 policy, (ECF No. 48), Defendants filed a cross motion for summary judgment, (ECF No. 57), and Warren filed a motion for partial summary judgment concerning Ohio Security's duty to defend under the Lobster 207 policy.  (ECF No. 55).

## DISCUSSION

### A.    Duty to Defend

Under Maine law, "[t]he meaning of language used in insurance contracts is a question of law."  *York Ins. Grp. of Maine v. Van Hall*, 1997 ME 230, ¶ 8, 704 A.2d 366, 369.  Ambiguous terms are generally construed in favor of the insured and against the insurer.  *Id.*  Courts are to "view the contract language from the perspective of an average person, untrained in either the law or the insurance field, in light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured."  *Peerless Ins. Co. v. Wood*, 685 A.2d 1173, 1174 (Me. 1996).  The insured bears the initial burden of showing that coverage for the injury exists, then the insurer bears the burden of showing that there is an exclusion from coverage, and the insured then bears the burden of showing there is an exception to an exclusion.  *Middlesex Mut. Assur. Co. v. Fish*, 738 F. Supp. 2d 124, 132 (D. Me. 2010).

In Maine, "an insurer's duty to defend is determined by comparing the allegations in the underlying complaint with the provisions of the insurance policy." *Found. for Blood Rsch. v. St. Paul Marine & Fire Ins. Co.*, 1999 ME 87, ¶ 4, 730 A.2d 175, 177. "An insurer has a duty to defend an insured when the complaint, read broadly in conjunction with the policy, reveals the existence of any legal or factual basis that could potentially be developed at trial and result in an award of damages covered by the terms of the policy." *Harlor v. Amica Mut. Ins. Co.*, 2016 ME 161, ¶ 8, 150 A.3d 793, 797. Although the inquiry into facts that could "potentially be developed" gives rise to a broad duty to defend, it is not "triggered by pure speculation as to conduct or causes of action that are not either set forth in, or fairly suggested by, the allegations of the complaint." *Prime Tanning Co. v. Liberty Mut. Ins. Co.*, 750 F. Supp. 2d 198, 208 (D. Me. 2010) (quotation marks omitted); *see also*, *Barnie's Bar & Grill, Inc. v. United States Liab. Ins. Co.*, 2016 ME 181, ¶ 9, 152 A.3d 613, 616–17, as corrected (Mar. 23, 2017); (teaching against "read[ing] extrinsic facts or allegations into an underlying complaint" or "selectively read[ing] facts or allegations out of that complaint in order to conclude that the insurer has a duty to defend"); *York Golf & Tennis Club v. Tudor Ins. Co.*, 2004 ME 52, ¶ 8, 845 A.2d 1173, 1175 ("we do not speculate about causes of action that were not stated").

There is evidently no dispute that the coverage for bodily injury and personal or advertising injury does not apply; the parties' dispute is focused on the coverage for "property damage." There is also evidently no genuine dispute that many of the factual allegations and asserted causes of action in the underlying amended complaint do not generate the duty to defend because the allegations are not covered (such as damage other

than "property damage" or damage that was not the result of an accident), or because an exclusion applies to the allegation, such as the exclusion for intended or expected damage.[7]

Defendants' primary contention is that at least one of the underlying claims, namely the conversion claim, could result in an order to pay damages for property damage through conduct that qualifies as accidental and not intended or expected. *See e.g.*, *Ocean Nat. Bank of Kennebunk v. Diment*, 462 A.2d 35, 39 (Me. 1983) ("The converter need not intend any conscious wrongdoing," only "an intent to exercise a dominion or control over the goods" and "a mistake of law or fact is no defense" to the tort claim) (quotation marks omitted). Plaintiffs maintain that the only damages alleged are lost profits resulting from the conversion, and lost profits do not constitute property damage.

Citing *Mitchell v. Allstate Ins. Co.*, 2011 ME 133, 36 A.3d 876, Defendants argue that when assessing an insurer's obligation, Maine law requires the court to consider plausible alternative ways to establish liability based on the pled causes of action and the circumstances alleged. Consistent with Defendants' argument, as part of its analysis in *Mitchell*, the Law Court wrote, "an insurer must provide a defense if there is any *potential* that facts proved could result in coverage. The facts alleged in the complaint need not

---

[7] While there was some dispute about which provisions operate to exclude most damages for breach of contract claims as opposed to the separate exclusion for voluntary assumption of another's liability pursuant to a contract, the parties apparently do not genuinely dispute that contract damages awards are also generally excluded under the CGL coverages either explicitly or implicitly as a result of the other terms and definitions. *Compare e.g.*, Commercial General Liability Coverage A Exclusions b., i., m., *with* Coverage B Exclusions e., f.; *see also*, *Overview of commercial general liability policies*, 9A Couch on Insurance § 129:1 ("Whenever an insured business fails to perform in accordance with its contractual obligations, a claimant may recover against the insured for breach of contract damages. However, a commercial general liability insurance policy is generally designed to provide coverage for tort liability for physical damages to others and not for contractual liability of the insured for economic loss . . .").

make out a claim that specifically and unequivocally falls within coverage." *Id.* ¶ 10 (internal citations omitted) (emphasis in original).

The underlying plaintiff in *Mitchell* asserted claims against twenty-three fishermen for destroying, damaging, or converting his lobster traps and fishing gear. *Id.* ¶ 2. Although the underlying plaintiff alleged the fishermen acted "in an agreed upon and concerted effort," the Law Court concluded that the insurer had a duty to defend the underlying defendant because the allegation of intentional conduct "would not have to be proved for [the underlying plaintiff] to prevail on his conversion claim." *Id.* ¶¶ 17, 20.

The Law Court reasoned that the conversion claim could succeed at trial if, "[f]or instance," the underlying defendant "found and took the traps without knowing that they belonged to [the underlying plaintiff]" and the underlying defendant "damaged the traps in this process." *Id.* ¶ 19. For that reason, the conversion claim could result in liability for physical injury to or destruction of tangible property that would not be excluded from coverage as intended or expected as opposed to accidental. *Id.* ¶¶ 19–20; *see also*, *Gibson v. Farm Fam. Mut. Ins. Co.*, 673 A.2d 1350, 1353 (Me. 1996) (holding that there was a duty to defend against a trespass claim despite alleged intentional acts because there was a possibility that some of the alleged harms resulted from the unintended results of those acts); *Massachusetts Bay Ins. Co. v. Ferraiolo Const. Co.*, 584 A.2d 608, 610 (Me. 1990) (neighbor's complaint against gravel pit operator for trespass could be covered despite intentional acts if those acts were performed as a result of mistake of ownership of land). Under the reasoning of *Mitchell*, when assessing whether a duty to defend exists, a court

must consider whether the plaintiff plausibly could prove an alleged claim through facts that would bring the claim within the insurance coverage.

The essence of the relevant part of Lobster 207's conversion claim is that in accordance with the parties' agreement, Defendants lawfully came into possession of a certain number of Lobster 207's lobsters, but Defendants did not deliver all the lobsters to Lobster 207.[8]  *Mitchell* teaches that the duty to defend is not governed exclusively by Lobster 207's assertion that the difference in the number of lobsters obtained and delivered is the result of Defendants' deliberate effort to shortchange Lobster 207 on the number of lobsters.  As the Law Court explained in *Gibson*, "[a]n insured is not at the mercy of the notice pleading of the third party suing him to establish his own insurer's duty to defend." 673 A. 2d at 1352.

To prevail on its conversion claim, Lobster 207 does not have to prove that the difference is the product of Defendants' deliberate theft or conversion of the lobsters.  The issue, as it was in *Mitchell*, is whether under the circumstances alleged, there is a theory by which Lobster 207 could plausibly prove conversion for which Defendants would be covered by the insurance policies.  As Defendants note, they could be liable for conversion if the difference in the number of lobsters delivered from the number acquired was the product of Defendants' retention and consumption of the lobsters based on their belief that they were entitled to the lobsters.  In other words, Lobster 207 could prove there was

---

[8] In the Amended Complaint, Lobster 207 alleges Defendants "convert[ed] funds and lobster products from Lobster 207."  (Am. Compl. ¶ 44.)

physical injury or destruction of tangible property and thus property damage (i.e., the cooking and consumption of the lobsters) without establishing Defendants had a specific subjective intent to deprive Lobster 207 of its lobsters. The recognition of such an alternative theory of recovery in the assessment of Plaintiff's duty to defend would be in accord with the Law Court's reasoning in *Mitchell* and the trespass cases referenced above, *see Gibson*, 673 A.2d at 1353; *Ferraiolo*, 584 A.2d at 610.[9]

Plaintiffs' argument that the Law Court's decision *Barnie's Bar & Grill v. United States Liability Ins. Co.*, 2016 ME 613, 152 A.3d 613, requires a finding in Plaintiff's favor is unconvincing. In the case, the plaintiff alleged that Barnie's Bar was responsible for the damages he sustained as the result of an assault by another patron of the establishment. *Id.* ¶ 2. The Law Court concluded that an insurance carrier for Barnie's Bar had no duty to provide a defense against a complaint containing "an allegation of general negligence" because the policy excluded coverage for bodily injury resulting in any way from an assault or battery and the "only allegations of fact and law found in the [underlying plaintiff's]

---

[9] The parties also dispute whether Defendants could potentially be liable on the conversion claim for "property damage" based on the alternate definition of the term involving the "loss of use" of tangible property. Defendants argue they could be ordered to pay damages for Lobster 207's "loss of use" of lobsters. The insurers argue that the "loss of use" of "tangible property" does not include the "inability to sell" product in a free market and "does not include mere economic damage in the nature of loss of investments, anticipated profits, and financial interests." *L. Ray Packing Co. v. Com. Union Ins. Co.*, 469 A.2d 832, 835 (Me. 1983). The insurers also argue that a conversion claim forcing Defendants to return the property or proceeds from the sale of property they had no right to retain is not insurable and does not constitute a "loss of use" or an order to pay "damages." *See generally*, *Advanced Network, Inc. v. Peerless Ins. Co.*, 119 Cal. Rptr. 3d 17, 25 (Cal. Ct. App. 2010); *Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*, 272 F.3d 908, 910 (7th Cir. 2001). Because "an insurer has a duty to defend if any cause of action alleged in a complaint could fall within the policy's liability coverage," and because, as explained herein, the insurers have a duty to defend based on the "physical injury to tangible property" definition of property damage, the Court "need not consider whether other theories of liability" could also generate a duty to defend. *Mitchell*, 2011 ME 133 at ¶ 21; *see infra*.

complaint relate to the assault and battery on the bar's premises." *Id.* ¶ 8–9.  In *Barnie's Bar*, therefore, the Law Court was unwilling to imagine "some action or hidden defect or condition unmentioned in the complaint" which might theoretically give rise to a negligence claim against Barnie's Bar in an entirely different alleged factual scenario because every plausible theory of recovery under the facts alleged involved an assault or battery, which was explicitly not covered by the relevant insurance policy. *Id.* at 9.

Unlike in *Barnie's Bar*, as explained above, Lobster 207's inventory conversion claim can plausibly be established based on a theory of recovery within coverage provided by the policies.  Defendants do not ask the Court to imagine some other factual scenario that could theoretically lead to a conversion claim, such as the involvement of some property other than lobster, some other way Defendants could have come to possess the lobster, or a time frame or business relationship different than as described in the underlying amended complaint.  S*ee also*, *Iasbarrone v. First Fin. Ins. Co.*, No. 1:12-CV-230-NT, 2013 WL 3166342, at *2 (D. Me. June 20, 2013) (distinguishing the alternative explanations approved in *Mitchell* from efforts to "fundamentally change" the factual scenario underpinning the cause of action).  Defendants instead posit alternate mental states and a different explanation for the alleged discrepancy in the same quantities of tangible goods described in the underlying amended complaint. Defendants have advanced plausible alternate explanations that are consistent with and fairly suggested by the circumstances alleged in the underlying amended complaint. Consideration of the

alternative basis for conversion liability in this case is akin to the permissible assessment in *Mitchell* and unlike the approach rejected in *Barnie's Bar*.[10]

Plaintiffs' contention that the nature of the claimed damages (i.e., lost profits) controls and precludes coverage because the damages do not constitute "property damage" is also not persuasive. While some courts have found that lost profits, business losses, or reduced economic value were insufficient to trigger the duty to defend in the absence of physical injury to tangible property,[11] Plaintiffs provide no authority to support the contention that a duty to defend does not exist when a business or individual incurs lost profits resulting from or caused by physical damage or injury to tangible property as opposed to from the loss of use of the property. *See e.g.*, *Ferraiolo*, 584 A.2d at 610 n.2 (reasoning in a similar context that the duty to defend was not blocked simply because the party "derived an economic benefit from" the property at issue, because such a rule "would exclude from coverage a multitude of commercial activities, rendering liability insurance largely illusory for any business"); *Heldor Indus., Inc. v. Atl. Mut. Ins. Co.*, 551 A.2d 1001,

---

[10] To the extent that there is uncertainty or ambiguity as to whether the policy language and the principles outlined in *Mitchell* extend to the alternative explanation for conversion liability that Defendants offer here, "the doubt should be resolved in favor of finding that the insurer has a duty to defend the insured." *Union Mut. Fire Ins. Co. v. Inhabitants of Town of Topsham*, 441 A.2d 1012, 1015 (Me. 1982); *see also*, *Mitchell*, 2011 ME 133 at ¶ 20 ("Construing the policy in favor of coverage as we must . . . Allstate had a duty to defend"); *L. Ray Packing*, 469 A.2d at 833 ("the allegations of the underlying complaint are construed liberally and any doubt is resolved in favor of the insured"); *Auto Eur.*, 321 F.3d at 69 ("any lack of clarity must be resolved in favor of the insured").

[11] *See e.g.*, *Johnson v. Amica Mut. Ins. Co.*, 1999 ME 106, ¶ 5, 733 A.2d 977, 979 (alleged conversion of "bank account funds" and "right of payment" for misappropriated work did not trigger the duty to defend because it only implicated property rights that were "intangible in nature"); *Am. Internat. Bank v. Fid. & Deposit Co.*, 57 Cal. Rptr. 2d 567, 573 (Cal. Ct. App. 1996) ("Damage for lost profits, loss of investment or other harm to one's economic interest constitute injuries to intangible property which by definition fall outside the scope of the [CGL] policy").

1005 (N.J. App. Div. 1988) (coverage applied "when insured was sued for profit loss arising out of the destruction of a third-party's tangible personal property caused by a fire in the insured's building" but coverage did not apply when there was profit losses but "no physical property damage" to the tangible property of a third party).  Lobster 207 alleges that Defendants "convert[ed] funds and lobster products" and "wrongfully converted inventory and money."  (Am. Compl. ¶¶ 44, 296.)  Lobster 207's alleged loss from the conversion claim, therefore, includes the loss of the lobsters.  The lost profit is simply one means of measuring the loss that might prove to be the result of the physical injury to or destruction of the lobsters (i.e., tangible property under the policies).[12]

Plaintiffs' other arguments regarding the duty to defend fail for similar reasons. Plaintiffs argue that because Anthony and Josette are alleged in the underlying complaint to have participated in an unlawful enterprise for the purpose of enriching themselves, they were not acting as the employees, officers, or shareholders of Trenton Bridge and therefore do not qualify as insureds under the policies.  While some of the underlying claims, such as the RICO claims, might require proof of conduct outside the scope of Anthony's and Josette's duties as employees, officers, or shareholders of Trenton Bridge, other claims, such as conversion, do not require such proof.  *See Auto Eur., LLC v. Connecticut Indem.*

---

[12] An alternative means of measuring the damage could conceivably be the replacement cost of the lobsters. The insurers' lost profit argument might have more merit if the duty to defend was governed solely by the policies' coverage for "property damage" based on the "loss of use" of the lobster, because an injury to one's "total wealth" as a result of the mere "inability to sell the [tangible property] in a free market" arguably does not constitute "loss of use" damages within the insurance context.  *L. Ray Packing Co. v. Com. Union Ins. Co.*, 469 A.2d 832, 835 (Me. 1983).  However, because it is plausible that some or all of the alleged discrepancies between amount of lobsters that Defendants obtained and the amount they provided to Lobster 207 could be attributable to the physical injury to or destruction of the lobsters, the Court need not address the "loss of use" prong of the "property damage" definition.  *See supra*, n. 9.

*Co.*, 321 F.3d 60, 68 (1st Cir. 2003) ("we suspect that Maine's inclusive approach to the duty to defend is designed precisely for circumstances such as these—where a narrow reading of the complaint's factual allegations might preclude coverage, but the alleged cause of action is sufficiently broad that a modified version of the facts could be developed at trial to show liability").

Likewise, even though Warren is alleged to have terminated his employment with Trenton Bridge and started to work as CEO of Lobster 207, Lobster 207 is not required to prove Warren's job status to recover under one or more of the claims against him. Lobster 207 could plausibly recover against Warren based on conduct that occurred while he was performing duties as an employee, officer, or shareholder of Trenton Bridge. *Spurling v. Westport*, No. 1:21-CV-00053-JDL, 2021 WL 5702161, at *4 (D. Me. Dec. 1, 2021) (reasoning that "there can be no colorable argument that sexual assault is a professional service rendered by an attorney on behalf of his firm" but a jury could find no sexual assault occurred and still "could find that he breached his professional responsibilities to Doe while providing professional legal services to her, in the context of an attorney-client relationship").

Furthermore, Warren was also explicitly named as an insured under the Lobster 207 policy. He was covered under that policy as a named insured regardless of whether he was acting within the scope of his duties as CEO of Lobster 207.

Ohio Security argues that the policy in which Lobster 207 was the first named insured should be interpreted differently to avoid the possibility of coverage if the second named insured (Warren) is ordered to pay damages to the first named insured (Lobster

207).  The policy, however, specifically provides that the insurance applies "[a]s if each named insured were the only named insured," and the insurance applies "[s]eparately to each insured against whom a claim is made or 'suit' is brought" except for limited purposes such as the quantities of the policy limits.  (Ohio Security Lobster 207 Policy at 135.)  The plain language of the policy, therefore, precludes the insurer's suggested conclusion that the coverage for Warren only applies to Warren's *Poseidon* business or when he is acting within the scope of his responsibilities for Lobster 207.

In sum, under the plain reading of the policies, under Maine law, the insurers have a duty to defendant Warren, Anthony, and Josette.  Pursuant to 24-A M.R.S. § 2436-B, Defendants also seek fees and costs incurred in this action. Under the statute, if an insured (defined as a natural person and not a corporate entity) "prevails" in a declaratory judgment action "to determine an insurer's contractual duty to defend . . . the insurer shall pay court costs and reasonable attorney's fees."  24-A M.R.S. § 2436-B(2)*.*  Because the parties filed actions for declaratory judgment in part regarding the insurers' duty to defend, and because the individual Pettegrows (Warren, Anthony, and Josette) have established the insurers have a duty to defend against the underlying action, the Pettegrows have "prevailed" for the purposes of the duty to defend and, therefore, the Pettegrows would be entitled to recover court costs and reasonable attorney's fees as allowed under the statute. Accordingly, summary judgment in favor of the individual defendants is appropriate on their claim that Plaintiffs are liable under the statute for the individual defendants' court costs and reasonable attorney's fees. The amount of any recovery would be subject to proof.

## B.    Motion to Sever Claims

The insurers argue that if they have a duty to defend based on a claim like conversion, the other claims should be severed.  Plaintiffs contend that in *Gibson*, the Law Court suggested a flexible approach to the issue when the Court noted, "[w]e previously have held that in some circumstances the duty of an insurance company to defend one count in a lawsuit imposes a duty to defend all counts."  673 A.2d at 1354.  In practice, however, the rule has not been as flexible as the insurers' argument would require.  More recently, the Law Court has omitted any inquiry into the circumstances or the ease of apportioning the costs between various counts.  *See Mitchell*, 2011 ME 133, at ¶ 21 (declining to consider whether other claims could also create a duty to defend because "an insurer has a duty to defend if any cause of action alleged in a complaint could fall within the policy's liability coverage"); *Burka v. Garrison Prop. & Cas. Ins. Co.*, 521 F. Supp. 3d 97, 103 n.10 (D. Me. 2021) (noting but not applying "earlier more modest" statements of the rule).

Because there is a duty to defend against the conversion claim, and because the conversion claim arises out of the same common issues of fact as the other claims, severance is not appropriate.

## C.    Unfair Claims Settlement Practices Act

Maine's Unfair Claims Settlement Practices Act (UCSPA) generally prohibits insurers from making threats or knowing misrepresentations, failing to act within a reasonable time, or contesting liability or the amount of liability without a reasonable basis. 24-A M.R.S. § 2436-A; *see generally Curtis v. Allstate Ins. Co.*, 787 A.2d 760, 766 (Me. 2002).  The fact that Defendants' prevailed on the duty to defend issue is not controlling.

Generally, within wide bounds, "[r]easonableness determinations are, in essence, factual determinations." *Great Northern Storehouse, Inc. v. Peerless Ins. Co.*, No. 1:00-cv-00007-DBH, 2000 WL 1900651, at *4 (D. Me. Dec. 29, 2000). Whether it was unreasonable to take just over three months to respond and assume the defense is a determination to be made by a factfinder after assessing the relevant circumstances. *See Masters v. Allstate Ins. Co.*, No. 1:99-cv-00037-EWB, 1999 WL 33117068, at *2 (D. Me. Sept. 20, 1999) (insurer's delay of eighty-three days before denying coverage presented issue for a factfinder).

### D.   Legal Fees

Defendants argue American Fire and Ohio Casualty breached the insurance contracts because they should have reimbursed the full amount of legal fees Defendants incurred before the insurers began providing a defense, rather than reducing the amount by the portion of the fees attributable to the higher rates of a more expensive out-of-state law firm.  The insurers argue the additional expense from the higher rates did not represent "reasonable" costs to defend against the underlying action, and therefore, they were not required to reimburse Defendants for those costs under the terms of the policy.  Whether the fees are reasonable is a factual issue that precludes summary judgment on the issue.

### E.   Implied Duty of Good Faith and Fair Dealing

Maine law recognizes "that in every insurance contract an insurer owes a duty to act in good faith and deal fairly with its insured in the handling of insurance claims." *Maine Farms Venison, Inc. v. Peerless Ins. Co.*, 2004 ME 80, ¶ 17, 853 A.2d 767, 770 (internal quotation marks omitted).  Warren claims Ohio Security breached their contract by

violating the implied duty of good faith and fair dealing when it provided notice to Lobster 207 of Warren's tender letter. The insurers argue that as the first named insurer, they likely had a duty to provide Lobster 207 with notice of Warren's tender letter pursuant to the policy on which it was the first named insured. Even if the insurers were not required to notify the first named insured about a claim under the policy, there is no authority to support an actionable claim in the circumstances here.

### CONCLUSION

Based on the foregoing analysis, I recommend the Court find that Plaintiffs have a duty to provide a defense under the policies and the Court: (1) grant Defendants' cross motion for summary judgment regarding the duty to defend and on the individual defendants' claim that they are entitled to court costs and reasonable attorney's fees under 24-A M.R.S. § 2436-B and deny the cross motion regarding the other claims, (ECF No. 57); (2) grant Warren's partial motion for summary judgment regarding the duty to defend, (ECF No. 55); (3) deny American Fire's and Ohio Casualty's motion for summary judgment and motion to sever claims, (ECF No. 34); (4) deny Citizens' and Hanover's motion for summary judgment, (ECF No. 47); and (5) grant Ohio Casualty's and Ohio Security's motion to dismiss the implied covenant of good faith and fair dealing claim. (ECF No. 48.)

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen

(14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 30th day of December, 2021.